And on our first case, Keating v. Pittston, is it Vergonis? Vergonis. Vergonis, Mr. Vergonis. You are up, sir. Thank you. And would you like to reserve some time, sir? Yes, Your Honor. Four minutes for rebuttal, please. Four minutes. That is granted, and we will set the clocks accordingly. You are a go. Thank you. Good afternoon, Your Honors, and may it please the Court once again, Chris Vergonis for Appellant Mark Keating. As a parolee, Mark Keating had diminished expectations of privacy, but he also had Fourth Amendment rights that were clearly established on the date of the event set issue. And on that date, defendant officers committed five separate violations of those clearly established Fourth Amendment rights. In concluding otherwise, the District Court improperly resolved disputed issues of fact on summary judgment and made several errors of law. Did the parole officer have the right to enter the grandmother's house? No, Your Honor. The parole officer can search. Is that 3 James or 90 Market Street? 90 Market Street is the grandmother's house. Mr. Keating, that was owned by Mr. Keating's father. His grandmother had lived there before she passed away, and Mr. Keating was renovating it and would sleep there occasionally when the renovations ran late. In violation of his parole? There's nothing that forbids him in the parole statute. They haven't cited anything, and I'm not aware of anything that forbids a parolee from sleeping outside of his approved residence. Every night or occasionally? If a parolee sleeps somewhere else every night, that might be a new residence, and maybe then you have a residence violation. But he was there quite a bit, was he not? Sleeping there occasionally. I'm sorry, Your Honor? I thought he was there quite a bit. He was there a few nights a week. He was working late, and he was not forbidden from being there a few nights a week. Being there a few nights a week, doesn't that give the parole officer the right opportunity to visit? No, not unless the parole officer has a reasonable suspicion of a parole violation. Isn't it a parole violation for him to live there? It would be a parole violation for him to live there, but he wasn't living there, and the threshold question is whether the officer had probable cause to believe he was living there, and that's based on what the officer knows at the time. Okay, so now here's the question I have for you. The officer says he was told he was living there. And that's disputed, and that's inappropriate on summary judgment. Okay, so maybe you can point me to the record where it's specifically disputed. One exchange that I came up with during Mr. Keating's deposition is, did he ask you whether you were staying there? The answer is no. There are about four or five factual assertions that Mr. Coslett makes with regard to statements Mr. Keating made to him, and I don't see corresponding denials that create genuine disputes of material fact as to all of them. So, for instance, Agent Coslett says Mr. Keating told him he's living at 90 Market Street. Mr. Keating says all of his belongings are at 90 Market Street. Mr. Keating says he no longer lives at 3 James Street. Mr. Keating tells him, after being asked, do you wish to say you live at 3 James or 90 Market? I live at 90 Market. So I'm looking at those entries in the deposition transcript, and I'm trying to figure out, okay, so what are the corresponding statements from Mr. Keating that create the genuine disputes that would make us reverse? Sure, Your Honor. On page 104 of Mr. Keating's testimony, which is at 8-225, Mr. Keating is asked directly if he had told Coslett that he had been staying there on occasion, and he says, I don't believe so, no. So he didn't tell him that he had been occasionally staying there. Is it I don't believe so, or is it I don't believe so, no? I don't believe so, no. That's a denial. It's not really equivocal. We cite cases in our brief that it doesn't have to be a fully unequivocal denial to create a disputed issue of fact. And there are elsewhere in Keating's testimony, page 8-217, 8-226, where he talks about what he's doing at the Market Street Residence, and he says he's just there remodeling it. He would stay there once in a while. He would crash there when working late. He never concedes that he lives there, and, in fact, his testimony is to the contrary. But here's what I don't understand. So what creates the genuine issue if there is nothing in the testimony that specifically contradicts? I mean, there is the one exchange you just mentioned, but there were several that I read to you. Is it that one exchange that you're relying on? It's principally that one exchange, but the deposition testimony as a whole establishes that he was working there and would crash when he was there late and that he didn't tell Coslett that. He told Coslett he was remodeling it, but he didn't tell Coslett that he would sleep there. So Coslett had no basis for thinking that it was a residence. And even if he thought, even if Keating did tell him that he occasionally slept there, occasionally sleeping outside one's residence, we submit, is not enough to create probable cause to believe that the parolee is resigning there in violation of his conditions of parole. He's not forbidden from sleeping outside his residence. What was the reason why a new home agreement was entered into? According to Mr. Keating, it's because he had planned to live there in the future and Adrian Coslett said, let's sign this now so that you don't get jammed up later. And if you look at the home provider agreement, it's perspective. It's like an application for the place to be a residence. So it's future looking. It doesn't concede. First of all, Coslett didn't have that before he ordered Keating to let him into the property. Is it clear that that was after? It was. It's undisputed, I think, that that was after they entered, at least on Keating's version. You mean the first search? Your statement is it's after the first but before the second. Correct. Correct. And, again, just occasionally sleeping there doesn't give probable cause to think he was resigning there. Once he was in the residence, he committed another Fourth Amendment violation. It was clearly established by Arizona v. Hicks and other cases that a search must be within the scope of its justification. And here Coslett was allegedly in there to look for evidence of a residency violation. So he could open the refrigerator door to see if there was food. There wasn't. He could look for closets to see if there was clothing. He was not entitled to take a urinalysis? That's different. We dispute the results of the urinalysis, but he was entitled, or at least we don't contest that he was entitled to take the urinalysis, but we do contest that he was entitled to tear up the place, as Keating testified in his deposition testimony. I thought that Coslett instructed him to stay on the couch on the first floor and then found out that that was not the case. And then Mr. Lombardo, who was known to the police, apparently was there as well, and he disappeared. Mr. Lombardo was there, and there's disputed testimony about what happened to him, but there are two separate searches here. In the first search, Lombardo was sleeping on the couch. Coslett tore up the place on a fishing expedition for other parole violations. He flipped the mattress. He rifled through the drawers, which is not... Was that after the urinalysis or before the urinalysis? That was after the urinalysis, but Mr. Keating's position is that the urinalysis did not test positive for any drugs, and there's nothing... Did Coslett think it did? Coslett testified it did, but that's a disputed issue of fact. The jury is to believe it or not. There's no evidence in the record, no results from the supposed urinalysis. What's the basis for the dispute? Coslett does, I presume, a field test. What's the basis for Mr. Keating to dispute it other than, say, if he said that wasn't my urine, I suppose? Are you saying that you dispute the results because you think that there's something nefarious about the collection? Yes. You know, Coslett testified in this litigation that the results turned out positive. We have no evidence contemporaneous with the test that the results were positive. They didn't produce any documents or reports showing a positive result, and our view is that Keating testifies that he didn't have morphine in his system. Coslett did not tell him at the time that he tested positive, so we think it's a fabrication. Did the test indicate the results immediately? It's a little unclear. I think Coslett says that they did. And that wouldn't be sufficient to conduct a search? The positive test results might be sufficient to conduct a search for drugs, but, again, that's a disputed issue of fact. That's for the jury to resolve. We'll have summary judgment here. Now, how is that a disputed issue of fact for the jury to resolve if the question is, between the time of the initial search and the second search, if you have the following information, number one, a positive urine test, and number two, the checks that at least Coslett says were in plain view. And isn't that sufficient to call the police and do the broader search? Well, two responses. First, again, we dispute that he had a positive test for morphine, so that fact is in dispute. He had the checks. But here's what I don't get. What's the good faith basis for that? So, for instance, let's come up with an entirely different case. Let's say your client was a known drug user and the police officer comes over. He's a cocaine addict. And the parole officer comes over and says, you know, you look high to me. They take a urine test. The parole officer says it's positive. The person says, no, that's impossible. That's enough in that hypothetical to forego the parole officer from acting based on having taken the test? Or given the test, I should say? If there's a test and the finer fact includes a test was given and the test was positive, you know, whether that's a faulty test or not, that's enough to justify cause to search for a suspected parole violation of using drugs. Here we dispute the test. Was there a urinalysis test? This is at 8216. Yes. What was the result of that test? Nothing. Keating testified. Nothing, meaning it turned up negative. So, yes, if a jury concludes that there was a positive test for morphine, then the search for drugs was reasonable. I don't concede that the strip search then would have been. Our position is the strip search needed a warrant. But certainly you could search the residence for drugs if there was a positive result on the morphine test. But we dispute that there was a positive result. We haven't seen any paper or any record showing a positive result, and you would think that would have been produced in this case. I didn't get a chance to talk about the strip search. One moment. Yes. Thank you. I think we'll question you on your rebuttal on the strip search, but I do have one question to sort of send you on your way for the moment, and that is this. When we went through the back and forth between Agent Coslet and Mr. Keating with regard to what Mr. Keating's specific retort was to create the genuine issue, I remember the one exchange, did he ask you whether you were staying there and no, and then the other exchange, and at the point after he suggested that, did you tell him that you were staying overnight there on occasion? I don't believe so, no. I just want to make sure that those are the only two exchanges that you're relying on, and I know under the heat of battle there are more. So on rebuttal, I'd like you to attack that one for me. Okay. I'll take a look and find more specific pages. I think I said another page, page 74, if I believe of his testimony, but I'll look. You may have. Okay. Thank you, Your Honors. Thank you. Are you Mr. Autry? Yes. So you always get this. Any relation? Sixteen times removed. Close enough that the genealogist can track it, far enough that I did not get a share of the rights to Rudolph. Would there be anyone here who is not within 16 degrees of a relationship? Fair enough, Your Honor. The way we're going to divide the time is I'm taking seven minutes, eight minutes will go to Attorney DeLone, and the issues that I'm taking are going to be the qualified immunity issue, and since I represent the police officers who arrive second, the factual issues unique to them, whereas Attorney DeLone will handle the bulk of the factual issues related to the summary judgment standard, which relate to the parole officer, his client, and he'll also address the waiver issue that he raises as to the plaintiff's argument on appeal that is in his brief, not in mine, and the Pennsylvania law on parole searches, as opposed to the Fourth Amendment law, which his brief is in more detail than mine. Starting with the Fourth Amendment law that we believe is not clearly established, when it comes to the parole search area, there's a lot of open questions right now, and a lot of these are left open in the wake of the Sampson v. California decision, which the Supreme Court unequivocally determined that privacy interest than probationers. Yeah, could you pinpoint the issues in this case? What do we need to decide here? Your Honor, this court could decide, as the district court did, that there's been no constitutional violation. This court could also alternatively decide that the law is not clearly established, since there's no municipal liability claim. It's only the individual defendants. If there are genuine disputes of material fact, can we get to the qualified immunity issue? Your Honor, only if those genuine issues of material fact would show, if proven, a violation of the clearly established law, and we don't believe that they would. When you look at what is clearly established in this context, the plaintiffs are arguing that, for example, there's a warrant requirement for the Fourth Amendment for strip searches. It is not clearly established that strip searches in the parole context would require a warrant. Well, let's put aside the strip search for a moment. If there were genuine disputes as to material fact as to the, you know, we've separated the first search and second search. Let's say there were genuine issues as to the first search. Wouldn't that sort of taint the rest of the day with regard to the searches, because that would create a genuine issue as to whether there was a Fourth Amendment violation, would have to go to a jury? Your Honor, if the first search violated the clearly established law, then yes, that would taint the whole process with one caveat, which is unique to my clients, which is they arrived in the middle of it believing that it was his residence and after he had already signed the home provider agreement. And so they, we would argue, were entitled to rely on the representations of the parole officer when they arrived. So even if the parole officer, you know, even if there were a dispute as to what Keating told the parole officer before they arrived, they weren't privy to those conversations. And, you know, my colleague will address the actual conversation between the parole officer and Mr. Keating, but we would argue secondarily that even if you accept his version of the facts, it's not clearly established that the entry into the home by the parole officer before the officers arrived would have violated the Fourth Amendment. Under Sampson v. California, the Supreme Court in that case held that in California, police officers and parole officers don't even need reasonable suspicion to enter the home of a parolee. And when you look at it in this context, the Supreme Court has not answered the question as to whether the Fourth Amendment basically has a lower bar for searches in states like California than states like Pennsylvania. Generally speaking, the Supreme Court applies the same standards state by state. And in the Sampson case, for example, the Supreme Court cited one of its prior Pennsylvania cases as a reason for the justification and the importance of searches in the parole context and the parolees' diminished expectation of privacy. Let me ask you this. Just sort of jumping ahead chronologically, what's the consequence of Mr. Lombardo's presence and his flight? Your Honor, we believe that his... As it relates to your client. As it relates to my client, it would be for the second entry and whether that was a legitimate entry by the police officers. We believe it was. When you look at the protective sweep cases, this court has applied that doctrine, which is originally from the search incident to arrest situation, to searches even without an arrest. And in this case, they believed that there was an accomplice or someone in the residence associated with Mr. Keating that they had a prior relationship with that could be dangerous. And under that protective sweep doctrine, they had the ability to protect themselves and protect the parole officer by checking and trying to make sure that that person is secure. It turns out that in that short time frame, he was not secure and had fled out the back. But once they came in and he wasn't on the couch, they didn't know if he was hiding in a closet, if he was hiding upstairs. It appears he wasn't in the house at all or left at some point during the search, but they were not able to locate him. So their suspicions that at least he was not safely going to stay where he was were confirmed at the point they went in. And it is not clearly established that they could not do that second entry. It's also not clearly established, as plaintiffs would like it to be, that police cannot participate in parole searches. In the Sampson case, the Supreme Court categorically said that it was permissible for the police to initiate a parole search, which isn't even what we're talking about in this case. Other circuits have looked more directly at the question of police participating in parole searches and have said that it's completely reasonable for a parole officer for his own safety or her own safety to call for police backup just because of the unique consequences or the unique circumstances of the parole situation. Is it your position, based on what appeared to be Lombardo's flight and the concern of the officers, that that gave them the basis for the search of the entire premises? We believe that it at least gave them the basis for the search to go inside. I believe the search for the entire premises was based upon the initial justification for the parole search. We don't believe that this was a separate search that took place after that. We believe that the testimony is that basically there was an initial run into the house to look for Lombardo. He wasn't found. And then there was the more exacting search that the parole... Is that permissible as a parole search, the extent of that search? We believe it is. The Fourth Amendment doctrine has not limited the scope of a search in the parole context, as plaintiffs would like to believe it has been. They rely primarily on state law. But the federal courts have repeatedly said that it's really the federal laws, the Fourth Amendment, that establishes the extent of a search and what's permissible. When they look outside of state law, they rely on cases outside the parole context. They rely on warrant cases. But parole searches are different. In the warrant context, you can always go back to a judge, as long as your evidence isn't stale, and get a second warrant. And courts sometimes hold that the person doing the search should do that. Well, in the warrantless parole context, the parole officer doesn't... There's no real ability to do that. And so it would almost create a bigger limitation on parole searches than non-parole searches if you applied that warrant doctrine to the reentry in this case. Your description confused me for a moment, because I thought everyone was operating under the notion that there were two searches. You made it sound like three, or maybe it's just two as it relates to your claim. There's obviously the initial entry by Agent Coslett, right? Then there's the officers are inside and see Lombardo. Then, you know, their focus is distracted. He's gone. Then they do the search to find him. And then, based on what you've just said, there was then after that a more exacting search. Is that what you meant to say? Is that how it happened? I'm not trying to create this case into more elements than it is, but I do believe that there was a parole search that was done after Lombardo was found to be missing. And my colleague can correct me if I'm wrong, but I believe that's when the alcohol was found. I believe that's when the alcohol was found.  There's a denial there that there was alcohol, right? Well, I believe that's where the testimony was. Yeah. Well, I mean, yeah. Okay. We seem to have some different facts from the different sides. And at this point, we may say, well, so-and-so is incredible, but that's not our decision to make. Your Honor, we don't believe it's necessary to demonstrate that the alcohol was found in order to support the search. We believe that the search was supported by the appearingly stolen checks. Well, the testimony there is they were under a physics book, that they were not in plain sight. That's a new argument that the plaintiffs are making on appeal, but there's no reason to believe that the parole officer would not be able to look under the physics book. And I would also give the extra caveat. Well, I mean, what is plain sight? Was there sufficient evidence in plain sight that another crime had been committed? Your Honor, I don't believe in the parole search context that the parole search has to be limited to purely walking around for plain sight. I believe that the parole officer, in initial approval of a residence, is permitted to actually do a real search of the person's living area. But beyond that, I would give an extra caveat for my clients that they were relying on the parole officer, and at the time they arrived, the checks had already been found. And so, for their perspective, they would not have been involved in moving a physics book or anything along those lines or even aware of whether there was a physics book, even if you take the plaintiff's testimony on that prompt. And I have not been looking at my timer, but I believe I've probably hit seven minutes easily by now. You have. Don't worry about it. There's a little red light that's come on, yeah. Did you hear me? No. Thank you, Your Honor. Okay, thank you. Okay. Excuse me for the delay, Your Honor. Oh, no delay. You gave me an opportunity to collect my thoughts. How are you today? Okay, how are you? Good. And is it Mr. DeLone? Yes. Okay, very good. May it please the Court, my name is Bart DeLone.  I'm here on behalf of the Pennsylvania Attorney General's Office. And let me jump in to some of the questions the Court has already asked. You don't want to represent Agent Keating, do you? I'm sorry. Excuse me, Agent Consolid, I apologize, Your Honor. It's okay. You know the record's the record. We want to make sure the record's good. No, I don't want to represent Agent Keating, Your Honor. Let me jump in with some of the questions you had with respect to a dispute as to whether or not there was probable cause to believe that Mr. Keating was a resident of the Market Street residence. I would refer the Court to Appendix 319, which is Mr. Keating's own admission that he, in fact, did tell Agent Consolid that he occasionally slept at that residence. Now, there is agreement that there is a typographical error with respect to that admission, which either says well or well unaware of this residence. And it's our position that the typographical error is the two letters un. It's opposing counsel's position that the typographical error is the word well. The problem with that is that if you take out the word well, the rest of the sentence still doesn't make any sense, especially the part of the sentence that refers to Agent Consolid's testimony saying that Keating told him this. And the importance of this is that under Middle District Rule 56.1, if you don't dispute something, deny something, it's admitted. And we think the District Court quite correctly characterized this issue as undisputed. It was never presented below. It was never addressed below. You mean it wasn't presented as a disputed fact? No, it was not. And it was not presented as part of an argument to try and disqualify summary judgment. And as we point out in our brief, this Court has repeatedly held that you have to make specific reference to the argument you want to make so as to alert the District Court. And that was not done here. And one of the things that always irritates me about civil procedure in Pennsylvania is in Delaware, you have to put the request for admission and then the answer so you know what they're referring to instead of getting the answer, boom, and not knowing what the request for admission actually was. Well, Your Honor, here our admission was number 10. Excuse me, our statement was issued number 10. And what did 10 say? 10 says, hold on just a second, Your Honor. 10, here's what our 10 said. Keating primarily slept at the St. James residence but would sleep at the Market Street residence once in a while. Here's their response. Okay, so I mean, this is ‑‑ it's admitted then and you accept that he only slept there occasionally instead of all the time. Occasionally is enough, Your Honor. All he needed was probable cause to believe that it might be his residence. And as we cite in our brief, under 37 P.A. Curse,  under Code 63.4.2, you have to have one, the code actually calls it the approved residence. This is not a normal person. This is not a law‑abiding person, if you can use the language from Samson. This is a parolee. So maybe it's a parole violation, but that doesn't mean that it was his permanent residence. No, it doesn't necessarily mean it was his permanent residence, but under Commonwealth v. Smith, which is different from nonparole cases as my friend cites, like Arizona v. Hicks, once a parole agent has reasonable suspicion that a parole violation has occurred, he can search the house. Okay, so obviously you're ‑‑ He can search the residence or the particular house. He can search wherever the parolee has control over. The parole violation might be the fact that he's living in a nonapproved residence, but as my colleagues pointed out in their brief, under the, excuse me, Your Honor, under 61 P.A. C.S.A. 6151, they define real property as any residence. So he may only have one approved residence, but certainly somebody can live in two different residences, and if he has control over those residences, then they can be searched. And so he acknowledged, at least below, he acknowledged that he occasionally lived at this residence. That certainly gives you probable cause. And once he had established the reasonable suspicion that there was a parole violation here, he could search it, and he could search it any way he wanted. There's no limitations on that, and that's what Commonwealth v. Smith says. So he gets in the door merely by the fact that Mr. Keating occasionally lives there and the probable cause is the parole violation that he can investigate is whether or not he's living there? Whether or not he's in a nonapproved residence, Your Honor. Opposing counsel at some point in their reply brief seemed to suggest that the fact that they have now characterized it as, well, he admitted that he lived there, so he doesn't have to search it. Well, that's not how law enforcement works, Your Honor. If somebody says, well, you know, there are drugs in that house, but I told you that now, so now you don't have to look around. But there would be no purpose to the home provider agreement, right? Yeah, but the home provider agreement, as Agent Coslett says, I think Appendix 379, 380, is prospective. It is to explain when you need to get permission before you move into a house. And very specifically at 379, 380, the agent explains that the fact that he did that didn't undo his continuing parole violation. And, you know, I appreciate the zeal of opposing counsel. And they make a series of arguments here, and they're very imaginative, but they weren't made below. And I don't believe that our clients, and certainly the district court, are to be penalized for imaginative zeal, especially if trial counsel didn't have the same zeal. Let me just, real briefly, on ‑‑ I think we've touched on the search itself. It's our position, by the way, that this is not a separate search. And we cite to Kaplan, my colleagues cite to Joseph, this is not a circumstance where a long period of time went by and there was something separate, some sort of separate motivation to the search. This was simply a continuing search for parole violations. And one of the other things that the agent talks about, again, at 379, is he saw that there was another person in the premises. He also saw evidence that there might have been a new crime here, in addition to the parole violation. And he specifically testified that as a matter of police safety, he wanted further backup. And we cite to a whole series of cases where this court ‑‑ Excuse me, Mr. DeLong. Yes, Your Honor. Could you comment on the strip search, the basis for conducting it, and the standard and under the circumstances, was it reasonable? Yes, Your Honor. The basis for the strip search is 61PA6153, which gives a parole officer the capability of searching a parolee, including for contraband. And the statute is very clear that the standard there is reasonable suspicion. Again, my opposing counsel cite to a whole series of cases where one of the things you look to for that is past criminal behavior, crashed criminal records, and they cite to a whole series of cases saying, well, that alone is not enough. Well, we don't have that alone. We have Mr. Keating wandering around, going upstairs, definitely being ‑‑ it's undisputed that he's in the bathroom. It's undisputed that the toilet flushed. Well, if he flushed the evidence down the toilet, why did they search him? He should already be gone. Well, you don't know if he was completely accessible, Your Honor. And so, again, we have more than just his criminal background, but you can include the criminal background, and all you need under Pennsylvania law is reasonable suspicion, and we clearly had that here. On the detention, again, subjective reasonableness test, talked to you about how the agent was concerned with his own safety. We cite to a whole series of cases from this court and from the Supreme Court talking about the minute‑to‑minute tense decisions that have to be made that shouldn't be second guessed. This court is loath to do that. I don't think they should do that in this case. I'm going to go very fast, unless the court has any other questions, and just make one other point, which is on the qualified immunity, the opposing counsel's brief is replete with references to Lanier, which is a qualified immunity case, but that does say that general statements inherently don't give you guidance. But in that same paragraph, it also says that occurs when a general rule applies with particular clarity. Well, here we have these parole cases, not these generalized cases, and I agree with my colleague, even in these parole cases, it's not clear. So, V. Common, V. Carroll, I don't think these issues are at all beyond dispute, so we would win under qualified immunity, but I also think the court didn't make any errors based on the arguments that were presented to the district court for a while. Thank you.  Thank you. Thank you. Maybe you can start with the question that Mr. DeLone posed, and that is how did you preserve the challenge, specifically with regard of the change of address that we've been talking about? Whether he was residing there? The question is what did you do to preserve the challenge? That challenge, whether he was residing there. Well, we argue that the district court had improperly ruled on disputed issues of fact as to each aspect, and on the objection to the magistrate's report and recommendation at page 3 of Keating's objection, we criticized the magistrate judge for resolving disputed issues of fact, relating to, among other things, entry. He had argued in the opposition to the summary judgment motions at page 6-7 of the opposition to Koslitz and 7-8 of the opposition to Tokar and Hussain that the entry was improper because it was the home of his parents, the place he was working, and that the privileges granted to a parole officer were of no use. And so those are places we preserved that. And every argument we make, I appreciate the compliment for imaginativeness, but every argument we made was made by Keating in the court below, maybe not with the same refinements that we make them here, but these arguments were made and addressed by the district court, which resolved these disputed issues adverse to Mr. Keating, which was inappropriate on summary judgment. You asked Judge Greenway about places in the record. Keating's testimony at 72-73, 103, and 106, which are pages 8-217, 225, and 226 of the appendix, described the circumstances of what he was doing at the house on Market Street and what Koslitz knew. Mr. DeLone said once in a while he would sleep there, so no one thinks Keating was living there. They think he was sleeping there once in a while. And there's a legal question about whether once in a while is enough to establish residency. Do you need to establish residency to have reasonable suspicion? The cases, especially Commonwealth v. Edwards, say you need to have probable cause to believe it's the residence in order to search it under the exceptions for warrantless searches for a parolee's residence. So what we have before us is a statement by Agent Koslitz which says he told me he lives there and a statement by Mr. Keating that says he knows that I stay there occasionally. When you put those two together, that doesn't give Agent Koslitz the reasonable suspicion to go in? Koslitz didn't say he told me he lived there. He said he told me he sleeps there once in a while. That's at least what Mr. DeLone represented that their paragraph 10 stated. I don't have that in front of me. But, you know, people loosely use the term live there. The question is what are the relevant facts. Okay, but Mr. DeLone also said that if he has control over his residence, even if he doesn't live there, if he has control over it, he's the one in there doing the renovations, then you can search it. That's not what Commonwealth v. Edwards says. You need probable cause to believe he's residing there to search it under the residence provisions of the parole statute. And we think sleeping there occasionally is not residing there. And he read from the parole statute which says, one, the approved residence. So he can't have multiple approved residences. His approved residence, his residence was the James Street house where he slept most nights. He was working on this house and he would crash there occasionally. That's not residing there in any reasonable sense of the term. On the continuation search, we can see that if the facts show that Officer Consolid interrupted his search when it was incomplete in order to call for officer backup, that's a valid continuation of the original search. Here, the disputed facts viewed in the light most favorable to Keating shows that Agent Consolid completed the first search. He tore the place apart. He did everything he needed to do to search for the residence violation. He found these suspicious checks. He called them in. They weren't reported stolen. They were turned over to the police officers. What was the purpose under those facts of going back into the house? The searches were complete. This was a fishing expedition for more parole violations. If you were to ask the question, tell us on the date in question, where did your client live? I presume your answer is 3 James Street? Yes, Your Honor. And that's his answer as well. And that's reflected in the deposition testimony pages I cited. All right. So to the extent that those don't establish that, let's say he said, I don't believe so, or other seemingly equivocal answers, that wouldn't establish a genuine dispute as to a material fact. I don't believe so is what he responded to. Did you tell Consolid that you were sleeping there occasionally? I don't believe so, no. I think I don't believe so, no, is sufficient to put the fact in dispute. And the cases cited in our briefs say that that's enough. I know I'm out of time, but if Your Honors would indulge a couple of minutes on the strip search. I'll indulge a minute on the strip search. Thank you, Your Honor. Samson says that the requirements for a parolee search are established by state law. So this is one of those circumstances, hardly unique in the law, where state law defines the Fourth Amendment violation. So here, Pennsylvania state law was clear. Samson says state law has to clearly and unambiguously provide for the search. And here, Pennsylvania law did not clearly and unambiguously provide for strip searches of parolees. It says personal searches and searches of persons. We also have questions of fact. It's not undisputed that he has… You don't want to back up and talk at the same time, right? Okay. It's not undisputed that Keenan ignored an instruction not to move. No, no, no, that was an invitation to stop. Okay. I was trying to be nice. Thank you, Your Honor. You're welcome. Thank you. We'll take the matter under advisement.